IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| J.F., a minor child,<br><br>    Petitioner,<br><br>v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security Administration,<br><br>    Respondent. | Case No. CV 05-346-MHW<br><br>**MEMORANDUM DECISION and ORDER** |

## **INTRODUCTION**

Currently before the Court for its consideration is the Petitioner's request for judicial review (Docket No. 1) of the Respondent's denial of social security disability benefits. Petitioner brought this action seeking review of the decision of Commissioner Barnhart pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g). The Court has reviewed the petition for review, the answer, the parties' memorandums, and the administrative record, and finds that the decision of the Commissioner should be affirmed.

**Memorandum Decision and Order - Page 1**

# I.
# Background.

## A. Administrative Proceedings.

On July 31, 2002, Kathleen Funk filed an application for SSI benefits on behalf of her minor child ("Petitioner"). (AR 19.) Petitioner alleged disability since June 6, 2001. (AR 58.) The applications were denied initially on December 19, 2002 (AR 51), and upon reconsideration on February 18, 2003. (AR 50). After a timely request for a hearing was filed on June 26, 2003, Petitioner, represented by counselor, Andrea Cardon, appeared and testified before Administrative Law Judge (ALJ) Rand G. Farrer on May 4, 2004. Medical expert and psychologist, Roland P. Houston, Ph.D., and the claimant's mother, Kathleen Funk, also testified.

ALJ Farrer considered the testimony and all other evidence of record, and on September 23, 2004, issued a decision finding that Petitioner not disabled within the meaning of the Act and was therefore not entitled to supplemental security income benefits. (AR 32.) This became the final decision of the Commissioner when the Appeals Council declined to review the ALJ's decision on June 28, 2005. (AR 5.) 20 C.F.R. §§ 404.981, 416.1481 (1991). Petitioner has exhausted all administrative remedies and is therefore seeking judicial review pursuant to Section 405(g) of the Social Security Act.

## B. Statement of Facts.

At the time of the most recent hearing before the ALJ, Petitioner was 15 years old. He was thirteen years old at the time he filed the application in 2002. Petitioner alleged disability

since June 6, 2001, claiming disability based on severe impairments of bipolar disorder, oppositional defiant disorder, and hypoglycemia.

In July 1997, Petitioner was taken to a neurologist who performed an EEG on Petitioner, which revealed that Petitioner met the physiological requirements for ADHD based on his brain activity. This diagnosis was never confirmed by another treating physician or mental health professional.

On May 22, 2000, School Psychologist Larry Seitz had Petitioner perform WISC-III Testing, which indicated Petitioner had a Verbal (VIQ) score of 112, a Performance score of 120, and a Full Scale score of 117. Mr. Seitz assessed Petitioner's cognitive ability as falling within the high average range with, "[m]ental math facts appear[ing] to be the only area of weakness for the child." (AR 133.) Mr. Seitz further reported, "Areas of strength include visual memory for essential detail, general information from auditory memory, social sequencing and social knowledge." (AR 133.) Mr. Seitz further noted that Petitioner had no history of serious disciplinary problems, but that he was experiencing some academic difficulties.

On June 6, 2001, Mark Staffer, M.D., diagnosed Petitioner as follows

| | |
|---|---|
| Axis I: | Bipolar Disorder, NOS |
| | Oppositional Defiant Disorder, NOS |
| | Features of Attention Deficit Hyperactivity Disorder |
| | Alleged Witness of Domestic Violence |
| | Mathematics Disorder |
| | Disorder of Written Expression |
| Axis II: | No Diagnosis |
| Axis III: | History of hypoglycemia |
| Axis IV: | Psychosocial and environmental problems. Separation from father. Parental divorce. Continuing parental conflict. |
| Axis V: | GAF 45-50 |

**Memorandum Decision and Order - Page 3**

Dr. Staffer evaluated Petitioner again on June 20, 2001, and found the same diagnosis and GAF rating.

Before Dr. Staffer evaluated Petitioner, Petitioner began seeing Roger W. Abernathy, Ph.D., between January 2001 and June 5, 2001. Dr. Abernathy noted Petitioner was initially diagnosed as suffering from chronic post traumatic stress disorder as a result of events causing, "intense fear that occurred when he was an infant and young child."

On October 1, 2001, Petitioner began attending group therapy sessions with Patrick Wilder, CSWP. Petitioner continued with this treatment through March 18, 2002. After Petitioner's first group therapy session, Mr. Wilder noted, "[Petitioner's] mood and affect present as very flat and somewhat depressed. He was not oppositional. He participated fairly well and toward the end of group he engaged with the other boys, although he could use some improvement in this area." (AR 187.) During the course of Petitioner's sessions, Mr. Wilder reported that Petitioner continued to experience problems with depression, but that he also continued to interact well with the other boys in the group. (AR 168-187.) Mr. Wilder also reported that Petitioner's mother continued to complain of Petitioner's oppositional behavior and angry outbursts at home. *Id.*

In January 2002, Petitioner was hospitalized at St. Alphonsus Regional Medical Center for approximately two weeks. Upon admission, Richard J. Pines, D.O., noted Petitioner presented the following symptoms:

> [Petitioner] is a 12 1/2-year-old white male with a longstanding history of complicated behavioral and emotional problems which had increased in severity and frequency over the days lead up to this hospitalization. Over that 24-hour period prior to hospitalization, [Petitioner] had become increasingly more "out-of-control." [Petitioner] was making threatening comments toward his mother and younger

> brother.  He was being physically aggressive towards his younger brother.  He was refusing to follow through on rules, limits, and structure at home, and he was felt to be a danger to himself and others.
> (AR 146.)

Despite Petitioner's problems that led to his hospitalization, Petitioner began to show improvement during his group therapy sessions.  On February 2, 2002, Patrick Wilder, CSWP, noted, "[Petitioner] was re-admitted to outpatient psychiatry services following a brief 2-week hospitalization.  [Petitioner] seems to have shown dramatic changes; most notably, his mood and affect have brightened significantly and he seems to have an overall better outlook on self and world." (AR 173.)  Because of Petitioner's significant improvements, Petitioner was released from attending the group therapy sessions.

According to those individuals who observed Petitioner's behavior, Petitioner's problems appear to be centered in the home when he interacts with his mother and younger brother; Petitioner's problems in school are less severe.  A school nurse and counselor noted in February 2002 that Petitioner had seemed quiet, withdrawn, and depressed at school.  The counselor further noted, "Mother reports behavior at home: 1) [Petitioner] hits mother, chokes younger brother; 2) Family counseling; and 3) Behaviors are seen at home, not at school" and "[Petitioner] does well at school - No behavior problems.  He keeps home and school separate." (AR 104-105.)

Petitioner's academic performance has been somewhat erratic, ranging from A's and B's to F's in some semesters.  Petitioner requires special education classes to help in mathematics and written expression.  Petitioner apparently has some difficulty finishing homework and completing other tasks.  One of Petitioner's teachers, who observed him in the learning lab,

Resource Room Teacher Kathy Reich, indicated that Petitioner had a slight problem with: "handling frustration appropriately"; "identifying and appropriately asserting emotional needs"; "using appropriate coping skills to meet daily demands of school environment"; and "knowing when to ask for help." (AR 99.) Overall, Petitioner appeared to behave well while at school and was even described at one time as a "model student." (AR 359.) However, in October 2002, Petitioner was disciplined for bringing a snake, pocket knife, and lighter to school. (AR 356.)

At home, Petitioner's mother reported problems with Petitioner playing with fire, lying, and stealing. Karen Andrews of the Idaho Department of Health and Welfare Family and Children's Services, performed a preliminary assessment on Petitioner on May 13, 2002. Following that assessment, Ms. Andrew recommended family counseling rather than solely focusing on Petitioner's conduct. Petitioner's mother complained because, "nothing was specifically directed towards [Petitioner] and 'all the lying and fighting he does at home.'" (AR 215.) Karen Andrews further observed, "Kathleen is unhappy that the treatment recommendation was for family counseling and parenting classes. She believes something is 'wrong' with [Petitioner] and she wants 'preventative' treatment so that, down the road, he doesn't go crazy and hurt someone." (AR 216.)

On June 7, 2004, Petitioner's mother wrote a letter detailing incidents that occurred subsequent to the hearing. According to Petitioner's mother, Petitioner was placed in a diversion program where he was required to perform community service and pay restitution. Apparently, Petitioner began community service at "Doggie Detailing," but was sent home after one day for the reasons outlined in the June 7, 2004 letter. After Petitioner began work with a crew that performed Community Service, he had to stop working because he received two more charges.

**Memorandum Decision and Order - Page 6**

The first charge related to stealing another boy's tennis shoes and the second charge related to Petitioner's stealing of an IPOD from a local church. After these incidents, Petitioner's mother and doctor decided to hospitalize Petitioner for observation and new medication.

> On June 30, 2004, Eric Gilbreath, M.D., wrote:
>
> [Petitioner] is treated in our clinic for Bipolar I Disorder and ADHD. He has been hospitalized on two occasions for exacerbation of his symptoms.
>
> [Petitioner] has extreme mood fluctuation with depressive times and manic times. His symptoms include sleep problems, agitation, aggression, poor energy, feelings of hopelessness and worthlessness. This alternates with feelings grandiosity, distractibility, and high risk behavior and some paranoia.
>
> Currently, [Petitioner] has just been released from the hospital and remains stable. He will need intensive therapeutic assistance and medication management long term to remain stable.
>
> (AR 372.)

## II.
## Findings of the Administrative Law Judge.

In the decision issued following the hearing, the ALJ made specific findings as follows:

1. The claimant has never engaged in substantial gainful activity.

2. The medical evidence establishes that the claimant has bipolar disorder-mild, conduct disorder, oppositional defiance disorder (moderate), parent child problems (severe), disorder of written expression, and mathematics disorder (mild to moderate) impairments which are "severe" as defined in the Regulations [sic].

3. The medical evidence further establishes that the claimant does not have an impairment or combination of impairments that meets or medically equals the criteria for any listed impairment.

4. The claimant's and the claimant's mother's testimony was partially credible for the reasons set forth in the decision (SSR 96-7p).

5. The evidence establishes the following functional limitations resulting from the combined effect of all of the claimant's impairments and reasonably related symptoms: less than marked limitation in the domain of attending and completing

        tasks; less than marked limitation in the domain of interacting and relating with others; no limitation in the domain of moving about and manipulating objects; no limitation in the domain of caring for yourself; and no limitation in the domain of health and physical well-being.

6.    The claimant's combination of impairments does not functionally equal the listings.

7.    The claimant has not been under a disability at any time through the date of this decision (20 C.F.R. § 416.924(d)(2).

## III.
## Standard of Review.

On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRAWORA"), which amended the statutory standard for children seeking SSI benefits based on disability. *See* § 211(a) of Pub.L. 104-193, 110 Stat. 2105, 2188-89 (codified at 42 U.S.C. § 1382c(a)(3)(C)). The new standard and its accompanying regulations were more stringent than their pre-PRAWORA counterparts, requiring a greater showing from an SSI disability claimant. *Harris v. Apfel*, 209 F.3d 413, 419 & n. 36 (5th Cir. 2000). Under the revised standard, a child seeking SSI benefits based on disability will be found disabled if he or she has a medically determinable impairment "which results in marked and severe functional limitations," and which meets the statutory duration requirement. *See* 42 U.S.C. § 1382c(a)(3)(C) (1994 & Supp. II 1996).

A physical or mental impairment is defined by the statute as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A three-step sequential evaluation process promulgated by the Department of Health and Human Services is used to determine whether a child under the age of 18 is eligible

for benefits. The ALJ considers, in the following sequence: (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a severe impairment or combination of impairments; and (3) whether the impairment, or combination of impairments, meets, medically equals, or functionally equals in severity to any of the listed impairments.  20 C.F.R. § 416.924. An impairment functionally equals in severity a listed impairment if it results in marked limitations in two domains of functioning or an extreme limitation in one domain of functioning. 20 C.F.R. § 416.926a(d).  The domains assessed are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R.  § 416.926a(b)(1)(i)-(vi).

On review, the Court is instructed to uphold the decision of the Social Security Commissioner if the decision is supported by substantial evidence and is not the product of legal error.  42 U.S.C. § 405(g); *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); and *DeLorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater,* 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 108 S. Ct. 2541, 2550, 101 L. Ed. 2d 490 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist which supports the petitioner's claims.  42

**Memorandum Decision and Order - Page 9**

U.S.C. § 405(g); and *Flaten v. Secy of HHS,* 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. *Id.* It is well-settled that if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel,* 188 F.3d 1087, 1089 (9th Cir. 1999).

## IV.
## Issues Raised.

The primary issue before the Court is whether the final decision of the Secretary is supported by substantial evidence and whether it is based on proper legal standards. *Matney ex rel. Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992). Petitioner contends that the ALJ erred in the following respects:

1) The ALJ erred in finding that Petitioner's impairment or combination of impairments do not at least functionally equal the Listings.

2) The ALJ failed to properly support his finding that the testimony of the Petitioner's mother was not credible.

The Court will take each argument in order.

## V.

## Discussion

**A. Did the Petitioner's Limitation Functionally Equal a Listing.**

The Petitioner's arguments in this regard center around his position that if the ALJ had given controlling weight to the opinions of Becky Yancey, LCSW, and Dr. Gilbreath, then Petitioner impairments met or equaled the level of severity required by the listings.

**1. Becky Yancey's Opinion**

In 2004, Petitioner's treating health therapist, Becky Yancey, LCSW, diagnosed Petitioner as suffering from bipolar disorder, conduct disorder, learning disorder, antisocial personality features, schizoid personality features, and obsessive-compulsive personality features.  Ms. Yancey also noted Petitioner exhibited kleptomaniac tendencies.  Ms. Yancey concluded Petitioner needed daily therapeutic interventions that could be best achieved if Petitioner was placed in a residential treatment center.  A psychiatrist, Scott H. Armentrout, Ph.D., also signed the form.

The ALJ gave three reasons for discrediting the opinions of Ms. Yancey: (1) the opinions were contradicted by the medical expert who had an opportunity to review the medical file and who was familiar with the Social Security benefits to establish a disability; (2) the report did not address whether Petitioner had "marked" or "extreme" limitations to be found disabled; and (3) the ALJ did not consider her an acceptable medical source pursuant to 20 C.F.R. § 416.913.  As both sides acknowledge, the opinions of those who are not an acceptable medical source are to be given "less weight" than the opinions of those who are.  *Gomez v. Chater,* 74 F.3d 967, 970-71 (9th Cir. 1996).

Petitioner argues the ALJ should have considered Ms. Yancey an acceptable medical source under 20 C.F.R. § 416.913, although she is not a licensed or certified psychologist, because her opinions are the product of an interdisciplinary team.  The Commissioner argues that Ms. Yancey appears to have a solo-practice as a mental health therapist and was not working as a member of any interdisciplinary team during her evaluations of Petitioner.  This is one of those rare instances where both sides appear to be at least partially correct.

The Code of Federal Regulations distinguishes between those opinions coming from "acceptable medical sources" and those coming from "other sources." 20 C.F.R. §§ 404.1513(a) and (e), 416.913(a) and (e). From this, 20 C.F.R. §§ 404.1527 and 416.927 each set forth similar guidelines for the Commissioner to follow when weighing conflicting opinions from acceptable medical sources, while containing no specific guidelines for the weighing of opinions from other sources. This permits the Commissioner to accord opinions from other sources less weight than opinions from acceptable medical sources.

Acceptable medical sources specifically include licensed physicians and licensed psychologists, but not counselors or nurse practitioners. 20 C.F.R. §§ 404.1513(a)(1) and (3); 416.913(a)(1) and (3).  However, a non-acceptable medical source who conducts an evaluation as part of an interdisciplinary team "that contains the evaluation and signature of an acceptable medical source, is also considered acceptable medical evidence."  20 C.F.R. § 416.913(a)(6); *see also Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).

In *Gomez*, the Ninth Circuit, interpreting 20 C.F.R. § 416.913(a)(6) narrowly, held that a nurse practitioner could only be considered an acceptable medical source if the record clearly established "she was acting as an agent of an acceptable medical source." *Id., see Nichols v. Commissioner of Social Sec. Admin.*, 260 F. Supp. 2d 1057 (D. Kan. 2003).  The *Gomez* court observed, in deciding that the nurse practitioner and physician constituted an "interdisciplinary team" within the meaning of the regulations, that the nurse practitioner had consulted the supervising doctor regarding the claimant's treatment on "numerous" occasions and that she worked closely under the supervision of the doctor and as his agent.

**Memorandum Decision and Order - Page 12**

In this case, the record is at best unclear whether Ms. Yancey acted as an agent of Dr. Ahmentrout as required under *Gomez*. Dr. Ahmentrout worked with Warm Springs Counseling Center & Training Institute and signed off on a Psychoeducational Evaluation with Allsion Entnyre, M.A. on February 28, 2003. (AR. 2261-270.) Ms. Yancey also worked for a period of time in 2002-2003 at Warm Springs and records from her counseling sessions with the Petitioner during that time frame were part of the records from Warm Springs submitted at the hearing. Dr. Ahmentrout's signature or approval of her observations do not appear on these records nor did Ms. Yancey appear to be a member of the evaluation team. On October 29, 2002, Ms. Yancey did sign a treatment plan along with her supervisor and a physician. But other than this there is no joint report to show during her counseling sessions she was closely supervised by a recognized medical source. Even if it could be considered that she was part of a "team" several other records submitted at the hearing establish that she also saw the Petitioner at her private practice under the name of Counseling Associates, PLLC, from which her report and initial treatment plan were authored in April of 2005. (AR 257-260.) While a supervising psychiarist signed the last page of the report, there is no clear showing that she was acting under the direction of an acceptable medical source as required by *Gomez*. For these reasons, the Court cannot conclude that Ms. Yancey worked as an "agent" to Dr. Ahmentrout with any degree of certainty. Rather, it appears Ms. Yancey maintained her own separate practice and while at Warm Springs did counsel the Petitioner.

As mentioned, the "acceptable medical source" was only one of three reasons why the ALJ placed less weight on her opinion. Whether she at one point was a member of a interdisciplinary

**Memorandum Decision and Order - Page 13**

team and the ALJ failed to note this is harmless err at best, particularly when the other contacts Ms. Yancey had with the Petitioner would put her as a non-medical source under *Gomez.*

"[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence...and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citations omitted)).

Here, the ALJ provided reasons for disregarding Ms. Yancey's testimony. Specifically, he noted that Ms. Yancey did not address whether Petitioner had "marked" or extreme limitiations. In addition, the ALJ found that the opinion of the medical expert contradicted Ms. Yancey's opinion. For these reasons, the ALJ opted not to adopt the opinions of Ms. Yancey. This constitutes sufficient "germane reasons" to support the ALJ's determination in this matter.

**2. Dr. Gilbreath's opinion**

Petitioner also argues that the ALJ did not properly consider the opinion of Eric Gilbreath, M.D., who noted Petitioner suffered from extreme mood fluctuations, sleeplessness, aggression, poor energy, and feelings of hopelessness and worthlessness, which alternate with feelings of grandiosity, distractibility, and high risk behavior and some paranoia. Dr. Gilbreath further noted that Petitioner remained stable but would require "intensive therapeutic assistance and medication management long term to remain stable."

**Memorandum Decision and Order - Page 14**

The ALJ, while considering Dr. Gilbreath's opinion in determining whether Petitioner met or equaled listing-level severity, placed more weight on the medical expert's opinion. Dr. Gilbreath did not specifically state Petitioner's functional limitations or provide a listing opinion. The ALJ also disregarded Dr. Gilbreath's opinion because his opinion was contradicted by the opinion of the medical expert, who reviewed the file and observed Petitioner's testimony.

Under *Regenitter v. Commissioner,* 166 F.3d 1294, 1298 (9th Cir. 1999), an ALJ is required to give clear and convincing reasons for rejecting the opinion of an examining physician, which Petitioner argues is lacking in this case. Specifically, Petitioner takes issue with the ALJ's statement that Dr. Gilbreath's opinion was "contradicted by the opinion of the medical expert who had the opportunity to review the file, had the opportunity to observe the testimony of the claimant and his mother..." on the grounds that the statement is incorrect. (AR 30.) In fact, according to Petitioner, the medical expert did not observe the testimony of Petitioner's mother, which detailed Petitioner's extensive problems at home. In addition, Petitioner notes that the medical expert did not have access to later evidence, i.e., the June 7, 2004, letter written by the Petitioner's mother, which, Petitioner argues, supports the mother's testimony during the hearing. For these reasons, Petitioner contends that the ALJ afforded too much weight to the opinion of the medical expert, who never examined Petitioner.

Here, the ALJ afforded more weight to the medical expert's testimony than Dr. Gilbreath's on the basis that "the medical expert had the opportunity to review the entire file, had the opportunity to observe the testimony, and is familiar with the regulatory requirements of the disability program." (AR 30.) Further, where the treating doctor offered no opinion as to Petitioner's functional limitations, or whether he met or equaled a listing, the ALJ was entitled to

**Memorandum Decision and Order - Page 15**

rely upon the opinion of the medical expert, which was supported by substantial evidence in the record.

While it is correct that the medical expert did not have the benefit of the mother's testimony and her letter, the ALJ did have all of that information before him when he issued his decision. The ALJ is charged with weighing all of the evidence. Where the evidence might rationally support either outcome, the Court must affirm the ALJ's findings. *See Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999). The ALJ states clear and convincing reasons for finding the medical expert's evaluation more persuasive than Dr. Gilbreath's. The ALJ's determination in this regard is supported by substantial evidence and findings should be affirmed.

### B. Failure to Support Finding that the Testimony of Petitioner and Petitioner's Mother Were Not Credible

The Respondent failed to respond to Petitioner's claim of err as to this point in Respondent's Brief. (Docket No. 16)  However the Court is aware of the legal standards to be applied in this area and does not find that Commissioner has conceded this claim to the Petitioner. The ALJ found the testimony of Petitioner's mother and the Petitioner relating to Petitioner's ability to interact and relate with others only partially credible. In partially rejecting the mother's testimony, the ALJ observed that the mother consistently complained that Petitioner had more significant problems than the medical evidence demonstrates. After making this observation, the ALJ went on to detail the extensive medical evidence contradicting the mother's statements.

Although courts have upheld the use of lay testimony in some instances, *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, (9th Cir. 1984), *citing Singletary v. Secretary of HEW*, 623

**Memorandum Decision and Order - Page 16**

F.2d 217 (2d Cir.1980), it is not the equivalent of "medically acceptable diagnostic techniques" that are ordinarily relied upon to establish a disability. *See* 42 U.S.C. § 423(d)(3); *Hall v. Secretary of HEW*, 602 F.2d 1372 (9th Cir.1979). Therefore, the ALJ properly discounted the testimony of Petitioner's mother, which contradicted the medical evidence and Petitioner's school records.

As for the ALJ's obligation with respect to assessing Petitioner's credibility, a disability determination "must contain reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p, available at 1996 WL 374186, at *4. The credibility assessment involves two inquiries. First, the claimant must produce objective medical evidence of an underlying impairment(s) and show the impairment(s) "could reasonably be expected to produce pain or other symptoms." *Batson v. Commissioner of Social Security*, 359 F.3d 1190, 1196 (9th Cir. 2004), *quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

The ALJ discusses the testimony of Petitioner and his mother on page 7 of the decision. The ALJ first recites the Petitioner's testimony and then the mother's testimony and states:

> The undersigned has considered the testimony of the claimant's mother.  He finds it to be only partially credible.  The claimant's mother opined that the claimant had more significant problems than the medical evidence demonstrates.  *Additionally, the record demonstrates that the claimant is able to attend school and perform satisfactorily.  Finally the bulk of the evidence demonstrates that to the extent the claimant has problems interacting with people they were largely confined to his interaction with his mother and brother.*  (Emphasis added)

(AR 25.)

The Petitioner had testified to his activities at the hearing. Viewed in a light most favorable to the Petitioner, they may have reflected some degree of limitation. But as highlighted above, the ALJ did not believe from the Petitioner's own testimony that he was entitled to a finding of disability, particularly when considered in light of all of the other evidence. Petitioner seems to suggest that Petitioner's own testimony established that he had marked or severe limitations. The Court has reviewed his testimony and it certainly does not support that type of a finding, except in the area of family relationships. And to the extent it could even be considered as such, the ALJ gave it less weight for the above reasons cited above. Therefore the ALJ met the appropriate legal standard of setting forth reasons, based on substantial evidence in the record, why he discounted Petitioner's testimony.

## V.

## Conclusion.

Based on its review of the entire record, the Court finds that the Commissioner's decision is supported by substantial evidence and is not the product of legal error. Therefore, the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act should be affirmed.

## **ORDER**

Based upon the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that** the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act be **AFFIRMED** and that the petition for review is **DISMISSED.**

DATED: September 7, 2006

Honorable Mikel H. Williams
United States Magistrate Judge